441 F.2d 962
 15 A.L.R.Fed. 552, 142 U.S.App.D.C. 272,
82 P.U.R.3d 271
 CITIES OF STATESVILLE, ET AL., Petitioners,
v.
ATOMIC ENERGY COMMISSION and United States of America,
Respondents, Duke Power Company, Intervenor.
POWER PLANNING COMMITTEE OF the MUNICIPAL ELECTRIC
ASSOCIATION OF MASSACHUSETTS et al., Petitioners,
v.
ATOMIC ENERGY COMMISSION and United States of America,
Respondents, Vermont Yankee Nuclear Power Corp., Intervenor.
 Nos. 21706, 21844.
 United States Court of Appeals District of Columbia Circuit.
 Argued Nov. 7, 1968.
Reargued en Banc June 26, 1969.
Decided Dec. 5, 1969.
 
 Mr. Joseph O. Tally, Jr., Fayetteville, N.C., with whom Messrs. Jack R. Harris, Statesville, N.C., Morris Chertkov and Worth Rowley, Washington, D.C., were on the brief, for petitioners in No. 21,706.
 Mr. George Spiegel, with whom Messrs. Worth Rowley and John C. Scott, Washington, D.C., were on the brief, for petitioners in No. 21,844.
 Mr. Marcus A. Rowden, Asst. Gen. Counsel (Solicitor), Atomic Energy Commission, with whom Mr. Charles M. Farbstein, Atty., Atomic Energy Commission, was on the brief, for respondents.
 Messrs. Howard K. Shapar, Asst. Gen. Counsel, Licensing & Regulation, Atomic Energy Commission, Robert E. Turtz, Atty., Atomic Energy Commission, Howard E. Shapiro, Attorney, Dept. of Justice, and Asst. Atty. Gen., Edwin M. Zimmerman, at the time the brief was filed, were also on the brief, for respondents. Mr. Thomas F. Engelhardt, Atty., Atomic Energy Commission, also entered an appearance for respondents in No. 21,844.
 Mr. Carl Horn, Jr., with whom Messrs. William H. Grigg, Charlotte, N.C., Roy B. Snapp, Carlton A. Harkrader and Wm. Warfield Ross, Washington, D.C., were on the brief, for intervenor in No. 21,706. Mr. Joel E. Hoffman, Washington, D.C., also entered an appearance for intervenor in No. 21,706.
 Mr. George H. Lewald, So. Hanover, Mass., of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, for intervenor in No. 21,844. Mr. Jerome Ackerman, Washington, D.C., was on the brief for intervenor in No. 21,844.
 Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges.
 
 ON REHEARING EN BANC
 TAMM, Circuirt Judge:
 
 1
 On August 6, 1945, some four square miles of a city were destroyed by a blast from a bomb with the explosive force of 20,000 tons of TNT.[1] On August 9, 1945, 39,000 human beings were killed and 25,000 injured in a similar explosion. Five days later a fouryear war in the Pacific was over. In November, 1952, an island in mid-Pacific disappeared and in its place gaped a hole one mile wide and 175 feet deep. The TNT equivalent of such a blast is set at about 6,000,000 tons and the cause of that disturbance has become known as 'The Bomb.' A chronology of devastation does arise out of the exigencies of war-- hot and cold-- but because the success of peaceful civilization, like that of war, is dependent upon adaptibility to the environment, the inventive genius of destruction has now turned into an effort toward constructive and peaceable use of a most fantastic source of power.
 
 
 2
 The invention of the atomic bomb and its regrettable detonations have demonstrated that the fission or splitting of one pound of uranium yields an energy equivalent of 3,000,000 pounds of coal. That figure, translated into heat, amounts to about 10,000,000 kilowatt hours. It is therefore quite apparent why industry has sought to domesticate the atom and exploit its power with the intention of sophisticating both manpower and machinery in order to achieve a saleable product.
 
 
 3
 From the time our earliest ancestors squatted about their fires to this present century, the primary source of man's energy has been fossil fuel. Coal and its chemical family of wood, gas, kerosene, oil and the like have been appropriated by man to warm his cave, cook his food, light his home, power his automobile, and provide for his many general comforts in an ever-changing environment. This reliance, however, has had some visible side effects that are mounting in disturbing proportions. Man's failure to preserve his fuel supply through conservation has caused the available reserve of fossil fuel to diminish to the extent that man's energy needs must be supplemented by an alternative source within the next century. Moreover, this very mobile civilization of ours seems bent upon burning fuels to such an extent that modern pollution has contaminated the air we breathe, the water we drink, and the food we eat. Also, the exhaustive drain on our natural resources has occasioned irreparable damage in the area of their departure. It is therefore imperative that other means be employed to those same good ends of meeting mankind's needs.
 
 
 4
 The nuclear fission reaction, somewhat analogous to a fire, is maintained, in peaceful applications, by the nuclear or atomic reactor. Here a controlled chain of nuclear explosions occurs on a self-sustaining (and self-destructing) pattern. Traditional fossil fuel generators burn coal whereas nuclear generators 'burn' uranium, and, while the layman can make facile comparisons of this nature, nuclear reactor engineers are still struggling to find an efficient process for controlling the reaction. Thus, the basic problem in using atomic power to generate electricity is harnessing nuclear fission to drive more or less conventional turbines.
 
 
 5
 The first nuclear reactor to generate electricity was built on an experimental basis by the Argonne National Laboratory in 1951. In 1956, the British began to operate the Calder Hall station as a large-scale endeavor. These plants could neither produce electricity on the scale of the traditional coal-burners, nor compete economically at any scale. They were, however, the prototypes of what the power companies in the instant cases hope to develop. As late as 1967 the output of electricity from nuclear generating plants was only about one per cent of the total output of the conventional generators. It is hoped that by 1980 that figure will be about 37.5 per cent, but it is clear that the present experimentation must attain substantial success if that projected figure is to be realized.
 
 
 6
 It has been found that the cost of plant construction and technological skills, although immense, is surmountable in view of the economic return-- should all go well. However, at the present time, the efficiency of the fuel cycle is still an economic problem to be overcome before all can go well. This fuel cycle depends on the critical mass of the nuclear fuel, that is, the amount of fuel necessary to sustain the chain reaction. As frel is consumed, more fissionable atoms must be introduced into the system in order to perpetuate the reaction. Also, there are intricate fuel recovery problems. The 'waste product' of the reaction contains valuable amounts of fissionable material which must be recovered, reconditioned and replaced. This process is quite technical and quite costly. Extensive experimentation has been directed toward finding cheaper and more practical ways both of producing the desired chain reaction and of reprocessing the waste. This 'fuel burnup' problem can be analogized to the more familiar processes of coalburning generators. Suppose that out of one pound of coal used in a conventional generator, only one ounce is effectively 'burned,' leaving fifteen ounces of waste to be reconditioned before reburning. Efficiency in heat production could be realized only if an effective method of reusing the 'waste' product could be attained. Thus it is with the present nuclear reactors-- the problem is how to get the optimum effect from the minimum cause. In addition to the difficulty of finding an efficient means of recovering unused fuel, other major obstacles must be overcome before the full potential of atomic reactors can be realized. We list a few:
 
 
 7
 1. Initial cost of fuel.
 
 
 8
 2. Fuel contamination through radiation.
 
 
 9
 3. Contamination of reactor components through neutron absorption.
 
 
 10
 4. Thermal pollution.
 
 
 11
 Hopefully all these problems can be resolved, but there remains the practical problem of maintaining one's head 'economically' above water until practical solutions are found. It is therefore necessary that these problems of economy be overcome before widespread commercial use is feasible in the competitive sense.
 
 I. THE INSTANT CASES
 
 12
 A. Cities of Statesville, et al. v. Atomic Energy Commission
 
 
 13
 The petitioners are eleven North Carolina municipalities and Piedmont Cities Power Supply, Inc., a corporation formed to enable petitioners to conform to the North Carolina law which prohibits municipalities from owning an interest in a federally-licensed electric generating facility located outside their service areas. The respondents are the Atomic Energy Commission and the United States of America. The intervenor is the Duke Power Company, a public utility engaged in the production, transmission and sale of electric power in both North and South Carolina.
 
 
 14
 In the latter part of November, 1966, Duke Power Company, the intervenor herein, applied to the Atomic Energy Commission for a grant of authority to construct, use and operate three nuclear reactors to be located in its electric generating system in Oconee County, South Carolina. This application was filed in compliance with section 104(b) of the Atomic Energy Act of 1954, 42 U.S.C. 2134(b) (1964), with a view toward construction of 'utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes.' (For full text of applicable statutes see appendix.) These reactors are to be used by Duke in its production, transmission and sale of electric power. This application, along with certain amendments, was reviewed by the regulatory staff of the Atomic Energy Commission. It found that the construction and temporary operating permit would be consistent with the Act as implemented by Commission regulations. Subsequent to this preliminary review, the Commission announced that a public hearing on the Duke application would be held on August 29, 1967, to determine whether a provisional construction permit would be issued. The only issues were whether the construction and operation would be in compliance with 10 C.F.R. 50.35(a) (1968) with respect to health and safety, and in regard to the national security.
 
 
 15
 Prior to the hearing, the petitioners, with the exception of Piedmont Cities Power Supply, Inc., filed a protest with the Commission, alleging that they were customers of Duke and had been denied an opportunity to participate in the proposed venture. They alleged that the project, in its present form, clearly violated the spirit of the antitrust laws, and requested that Piedmont be given a share of the project so that it could represent the interests of the municipalities.
 
 
 16
 On August 9, 1967, this protest was dismissed on the ground that the Commission lacked jurisdiction of the subject matter in light of the narrowness of the August 29 hearing. Two days later the petitioners, filed a motion to intervene and a motion to dismiss the Duke application on the ground that the Atomic Energy Commission lacked jurisdiction, under section 104(b) of the Atomic Energy Act of 1954, to issue a construction permit. This motion incorporated by reference the former protest based on antitrust principles, and in addition asserted that the Duke application must be considered in light of sections 102 and 103 of the Act as one for a 'practical value' type reactor, and thus must comply with those and other provisions.
 
 
 17
 This motion to dismiss was likewise denied, but the municipalities were permitted to intervene in the proceeding on the issue of whether the application was properly before the Commission under section 104(b). Intervention was denied to Piedmont, however, on the ground that it had no present interest but only sought to acquire an interest. (Piedmont, as befoer noted, is a manufactured corporation set up in the hope that Duke Power would accord an interest in the plants to Piedmont, which by representation would protect the interests of the municipalities. North Carolina law prohibits these municipalities from having a direct interest in such ventures.) The Commission set September 12, 1967, as the date on which a hearing would be held to determine the health and security questions and also to determine whether the application was properly brought under section 104(b). The municipalities fully participated in this hearing.
 
 
 18
 On November 3, 1967, the Atomic Safety and Licensing Board issued its initial decision and ordered the Director of Regulations to issue to Duke a provisional permit on the ground that its application met the health and security standards set out by the Commission. It also held that the applicant was properly proceeding under section 104(b) of the Act. Duke immediately began construction.
 
 
 19
 All of the petitioners appealed the Initial Decision to the Commission: the municipalities on the ground that section 103 was controlling and Piedmont on the ground that it was improperly denied leave to intervene. On January 3, 1968, the Commission denied both appeals on the rationale that 'until there has been a 'demonstration of the practical value of such facilities for industrial or commercial purposes', utilization facilities which will provide a basis for commercial evaluation in connection therewith (i.e., 'leading to' such 'demonstration') may be licensed under Section 104b.' (J.A. I 144.)[2] It affirmed the denial of intervention to Piedmont, concluding that permission to intervene is a discretionary action, and that since the interests of Piedmont were 'remote and tenuous' and adequately represented by the municipalities, denial of intervention was not an abuse of discretion. It upheld the grant of intervention to the municipalities as 'sound' administrative procedure. On January 12, 1968, the petitioners filed a joint petition for reconsideration. On February 29, 1968, the Commission reaffirmed its earlier position and, while refusing to consider the antitrust problems (on the ground that the petition was untimely in this regard), nevertheless specifically held that it was without jurisdiction to apply such principles to section 104(b) permits. The petition for review in this court was filed in March of 1968.
 
 
 20
 B. Power Planning Committee of the Municipal Electric Association of Massachusetts v. Atomic Energy Commission
 
 
 21
 Petitioners are the Power Planning Committee of the Municipal Electric Association of Massachusetts, an organization consisting of the officals of thirtynine municipal electric utilities, and three municipal electric utilities that are also represented in the Power Planning Committee. The respondents are the Atomic Energy Commission and the United States of America. The intervenor is Vermont Yankee Nuclear Power Corporation, a corporation organized by ten New England utility companies in the hope of constructing and operating the proposed nuclear power facility. The companies, as stockholders, will get their supply of power from the corporation on a contract basis.
 
 
 22
 On December 2, 1966, Vermont Yankee filed an application with the Atomic Energy Commission for permission to construct, use and operate a proposed nuclear power reactor to be located in Vernon, Vermont. The application was also filed in compliance with section 104 (b) of the Atomic Energy Act of 1954, 42 U.S.C. 2134(b) (1964), in the hope of attaining a grant of authority for the construction of 'utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes.' As has been noted, this facility will be the source of power for Vermont Yankee in its production, transmission and sale of electricity in the New England area.
 
 
 23
 The application, with certain amendments, was reviewed by a regulatory staff of the Commission which apparently does a survey of the application in regard to Commission regulations. Upon completion of the review, the staff, with certain exceptions, reported that the application met Commission requirements for a construction permit. It found that the proposed facility was in accord with the Commission's regulatory scheme when viewed in the light of the public health and safety and national defense and security requirements. In an amendment to its application, Vermont Yankee requested that it be given an interim exemption from the financial qualifications requirement of Part 50 of the Commission's regulations.[3] The regulatory staff recommended that such an exemption be granted.
 
 
 24
 Following the staff report, the Commission, on June 27, 1967, issued a notice of a proposed hearing on the Vermont Yankee proposal to be conducted on August 1, 1967, by the Atomic Safety and Licensing Board.[4] The notice further indicated that the issues of public health and safety and national security, as well as the contemplated interim financial exemption, would be the subject of the inquiry.
 
 
 25
 On July 17, 1967, the petitioners filed a joint petition for leave to intervene in the hearing. This petition alleged that each was interested in purchasing a share of the proposed facility and that, should they be excluded from such an interest, each would be prohibited from purchasing the low-cost energy of the proposed venture. The petition further asserted that the action of Vermont Yankee appeared to violate provisions of the antitrust laws. Their position essentially was that they wished on opportunity to be heard on the question of their participation in this venture. They bolstered their position by arguing that their exclusion would be contrary to the concepts embodied in the antitrust laws.
 
 
 26
 On July 24, 1967, a supplemental petition for leave to intervene was filed by the petitioners on the ground that the application of antitrust principles must be directed toward the Vermont Yankee request for interim exemption from the financial qualification requirements of Part 50 of the Commission's regulations. On July 31, 1967, the Atomic Safety and Licensing Board entered a prehearing order denying intervention to the petitioners on the grounds (a) that the petitioners had no 'interest comprehended within the meaning and intent of the applicable statutory and regulatory provisions'; (b) that they failed to allege any immediate or substantive interest which 'may be affected by the present proceeding'; and (c) that, in any event, the contentions alleged in the petition to intervene were irrelevant to the issues pending before the hearing board (J.A. II 29-30). The petitioners appealed the prehearing decision on the ground that the license sought by the applicant was of a commercial nature rather than one for research and development, thus focusing on the issue of section 103 versus section 104(b) jurisdiction. This appeal was denied by the Commission as interlocutory but the denial was without prejudice to filing an appropriate exception after the Board's initial decision.
 
 
 27
 On December 8, 1967, the licensing board issued its Initial Decision affirming its preliminary decision of denial to the petitioners for leave to intervene; the Initial Decision also authorized the issuance of a provisional construction permit to Vermont Yankee. This permit was to be in compliance with section 104(b) of the Atomic Energy Act of 1954. The Board also authorized interim exemption from the financial qualifications requirements. On December 11, 1967, the Commission's Division of Reactor Licensing issued the provisional construction permit which took immediate effect. Like Kuke Power Company, the applicant commenced construction.
 
 
 28
 The petitioners filed their exceptions to the Initial Decision on the grounds that the Board erred in (1) failing to make an adequate investigation of the alleged antitrust violations; (2) denying the petition for leave to intervene; (3) permitting the application to proceed under section 104(b) of the Act: and (4) permitting the interim exemption from financial qualifications.
 
 
 29
 On April 8, 1968, the Commission denied all of the petitioners' exceptions and affirmed the Initial Decision of the Board. In its memorandum and order the Commission held that, as to the petition for leave to intervene, the petitioners had not shown how their interests 'will be affected by our determination on the radiological safety and national security issues in the proceeding' (J.A. II 95). The Commission refused to consider the anti-trust allegations as providing the necessary 'interest' for intervention under section 189(a) of the Atomic Energy Act as implemented in 10 C.F.R. 2.714 (1967). The Commission ruled that it had no authority to consider antitrust violations when considering a grant of authority under section 104(b) as indicated by the 'distinction which the Act draws between proceedings under Section 103 and Section 104b. as respects consideration of antitrust matters, and from a reading of the legislative history. * * * That history shows a deliberate limitation in the 1954 Act of the broader antitrust authority in licensing matters which had been contained in Section 7(c) of the Atomic Energy Act of 1946.' (J.A. II 96-97.) The Commission held, as to the allegations that the application should have been processed under section 103 rather than section 104(b), that the finding of practical value had not yet been made and that the rationale of its Duke decision would apply to the instant case. In dealing with the interim exemption from financial qualifications, the Commission held that the Board acted on a proper basis in permitting exemption and that since the financial qualifications of the applicant were yet to be determined, the interim exemption provided adequate safeguards while awaiting the outcome of those determinations.[5]
 
 
 30
 Following the aforementioned action of the Commission, the petitioners filed a petition to review in this court.
 
 
 31
 II. THE MERITS OF THE PETITIONERS' CONTENTIONS
 
 
 32
 The issues presented by these petitions are the following:
 
 
 33
 A. Whether, in both the Duke Power and Vermont Yankee cases, the Commission properly awarded the grant of authority under section 104(b).
 
 
 34
 B. Whether, in both cases, the concepts of antitrust law are applicable to grants of authority under either section 103 or section 104(b) of the Atomic Energy Act of 1954.
 
 
 35
 C. Whether, in the Duke Power case, the Commission properly denied intervention to Piedmont Cities Power Supply, Inc.
 
 
 36
 D. Whether in the Vermont Yankee case, the Commission properly denied intervention to those petitioners.
 
 
 37
 A. The Propriety of the Section 104(b) Grant
 
 
 38
 In evaluation the action of the Commission with respect to the question of whether section 103 or section 104(b) of the Act os controlling in these cases, our review must be limited to a finding of whether the Commission, in proceeding under section 104(b), acted reasonably and whether the facts before the Commission support its finding. Universal Camera Corp. v. NLRB,340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In Duke Power, the Commission held that 'the 'research and development' about which Section 104b. speaks encompasses as 'development' a demonstration that will provide a basis for commercial evaluation. Such 'commercial evaluation' * * * means an evaluation of the economic competitiveness of the nuclear facility with conventional power plants.' (J.A. I 143-44.) The Commission went on to require that 'until there has been a 'demonstration of the practical value of such facilities for industrial or commercial purposes" (J.A. I 144), these facilities will be licensed under section 104(b). What this means is that no commercial license will issue until there is a showing that these reactor types are 'practical' under section 102. The question, then, is what constitutes a 'practical value' showing under section 102.
 
 
 39
 The Commission, in January of 1966, held that a finding of 'practical value, while presupposing a determination of technical feasibility, also involves economic considerations, the essential economic test being the competitiveness of the (proposed) nuclear power plant with conventional power plants.' Determination Regarding Statutory Finding of Practical Value, 31 Fed.Reg. 221 (1966). The Commission, quoting from that proceeding, noted that "pending the completion of scaled-up plants, and the information to be obtained from their operation', there 'has not yet been sufficient demonstration of the cost of construction and operation of light water, nuclear electric plants to warrant making a statutory finding that any types of such facilities have been sufficiently developed to be of practical value" (J.A. I 144-45). In the final order of the Commission in the Duke Power case, it was demonstrated that the proposed plants of Duke Power are 'scaled-up' plants-- that is, that they exceed, substantially, the modified 200 (electric) megawatt plants that are currently operable but which have not yet been shown to be economically competitive with conventional plants. See J.A.I 144-47. The Commission admits that, based on data currently available, it is not capable of finding these large-scale plants to be practical within the meaning of section 102. The Commission apparently hopes that the facilities which are the subject of this action will provide the necessary data for making such a determination. The Commission has said that it will 'await a reliable estimate of the economics based upon a demonstration of the technology and plant performances' before it will make the 'practical value' finding. This position not only conforms to the wording of the Act, but also adheres to the expressed intent of the drafters of the 1954 law. Congressman Cole of New York, the 1954 Chairman of the Joint Committee on Atomic Energy, spoke to his colleagues on the floor of the House and specifically outlined what the Commission's duty would encompass under section 104(b) of the Act. At 100 Cong.Rec. 11,658 (1954) he made it clear that
 
 
 40
 After a reactor has been tested out under section 104(b) and its practicability as an atomic reactor has been established, and after it has been demonstrated that this force can be used economically competitively, the Commission then makes a determination that such a reactor as a type does have commercial utility. It may then license persons to use that reactor under the authority given to it as set forth in section 103.
 
 
 41
 We are called upon by petitioners' argument to make an independent finding of 'practical value' so as to require the Commission to hold a section 103 hearing. To do so would be a usurpation of the Commission's function-- a function which Congress has confidently delegated to its regulatory arm.
 
 
 42
 This is neither a field which is pregnant with legal precedent nor a field in which we can draw upon personal awareness of our surroundings or general knowledge gleaned from readings of the financial section of the daily newspaper. The field of nuclear engineering is one which the experts must dominate for the present time. All that can be required from them is that they make a bona fide attempt at clarity while acting within reason. The Commission, of course, is the technical arm of Congress in this field. It brings its expertise to bear on these problems and its interpretations of the statutes must be given effect, barring clear abuse or patent error. The petitioners in the Duke Power case admit that the determinations of 'practical value' depend upon logic and customary usage. The Commission, in its order and rulemaking regarding 'practical value,' has been both logical and sufficiently lucid that one not versed in the language of the atom can point out that the Commission does not stand alone in its doubt as to the 'practical' value of these proposed facilities. Several giants in the field of electric utilities are apparently not yet prepared to pour large amounts of their financial resources into nuclear power at this time. Consolidated Edison, Niagara Mohawk and Central Hudson Gas have indicated doubt as to the 'practical value' of these plants by their investment of 170 million dollars in a conventional fuel oil generator to be built on the Hudson River.[6] We admit that this somewhat crude 'economic weathervane' cannot guarantee all aspects of the weather, but it may be valuable in determining which way the wind is blowing.
 
 
 43
 Extending this analogy somewhat, we note in the June 6, 1969, edition of 'The Wall Street Journal' that the wind is not only blowing but is also variable. There, in an article entitled 'Reassessing Nuclear Power: Rising Costs, Delays Cause Electric Firms To Turn to More Conventionally Fired Units,' a staff reporter concludes:
 
 
 44
 Atomic power, which came into its own with a vengeance three years ago, is losing important ground to conventional means of generating electricity.
 
 
 45
 Electric utility companies, beset by sharply rising nuclear steam generating plant costs, long delays in getting the facilities built and operating, and criticism by local antagonists over alleged water pollution or safety hazards, are turning to more steam plants fired with coal, oil or natural gas. A number of utilities in recent months have substituted such conventional units for previously planned nuclear plants, and others indicate they may follow suit in the months to come.
 
 
 46
 Id. at 38 col. 1. The reporter goes on to describe the overall picture regarding the present disposition of electric utilities toward nuclear power facilities. He notes that 'many utilities are waiting to see how nuclear plants set to start operating this year perform before forging ahead on new nuclear programs.' Id. (It is almost as though the wind is watching to see which way the wind is blowing.) Significantly, the article relates that 'many utilities say the cost studies of two or three years ago showing a definite nuclear advantage can no longer be relied on.' Id. at col. 4. In support of this assertion, the article indicates that 'Pennsylvania Power & Light Co., Allentown, Pa., has received an extension from General Electric Co. on an option to buy two nuclear plants for 1975 and 1977 operation, and will use the extra time to take 'a long, hard look' at current cost comparison figures for nuclear and conventional power plants. * * *' Id. If the electric utilities feel compelled to take a 'long, hard look' at the practical economics of largescale plants from the viewpoint of their private pocketbooks, we think it not unreasonable to permit the Commission an opportunity to appraise the practical value of these facilities from the standpoint of the public interest. In the final analysis this court must rely on the Commission's expertise for a determination of practical value. It is the Commission's duty to so determine-- it is our duty merely to review.
 
 
 47
 The Commission, in proceeding under section 104(b), is not acting on a whim but by will-- the will of Congress as evidenced by the statute. In fact, the Commission has on occasion brought to the attention of Congress this very problem of distinguishing between section 103 and section 104(b) licensing. It has urged Congress that the traditional reasoning behind the distinction has ceased to be realistic. The fuel supplies, so jealously grarded in the past, have been found to be relatively abundant. Congress, however, has not sought to change the standards and thus the Commission must follow the will of Congress. It is axiomatic that if the change is to come, it must come from Congress and not from the Courthouse.
 
 
 48
 These points, perforce, apply to both cases under review. We hold the action of the Commission in proceeding under section 104(b) to be within its expertise, substantially supported in the record, reasonable and valid.
 
 
 49
 B. Applicability of Antitrust Laws to Section 103 and Section 104(b) Grants
 
 
 50
 We need not consider whether antitrust principles apply to section 103 licensing, because we have found that the Commission was correct in proceeding under section 104(b). Turning then to the question of whether the Commission must apply these principles to section 104(b) licensing, we note that the petitioners in both Duke Power and Vermont Yankee base their contentions (that these considerations must be taken into account by the Commission) on a broad public policy argument that can be seen running through many of the administrative law decisions of this court and other courts.[7] They say, correctly, that the Atomic Energy Act contains specific caveats urging the Commission to act in the public interest by promoting 'free competition in private enterprise.' 42 U.S.C. 2011(b) (1964). The petitioners also assert that section 105(a) of the Act, 42 U.S.C. 2135(a) (1964), makes it clear that antitrust laws ate applicable to everything contained in that chapter. Also, under section 105(a) the Commission is empowered to suspend or revoke licenses in cases where courts of competent jurisdiction have found antitrust violations. What petitioners fail to see is that, in reading the legislative history of this Act, one can find many examples of the drafters' intent to narrowly limit antitrust considerations to specific portions of the statute while expanding the health and national security considerations of the Act as a whole. In 1965 the Joint Congressional Committee on Atomic Energy favorably reported an amendment to section 271 of the Act of 1954. In so doing they recognized that the 1954 Act established that the 'AEC's regulatory control was limited to considerations involving the common defense and security and the protection of the health and safety of the public. * * *' S.Rep.No. 390, 89th Cong., 1st Sess. 4 (1965). The petitioners miss the distinction between the 1946 Act and the 1954 Act with respect to antitrust authority. Section 7(c) of the Atomic Energy Act of 1946, 42 U.S.C. 1807(c) (1946), warned the Commission that
 
 
 51
 where activities under any license might serve to maintain or to foster the growth of monopoly, restraint of trade, unlawful competition, or other trade position inimical to the entry of new, freely competitive enterprises in the field, the Commission is authorized and directed to refuse to issue such license or to establish such conditions to prevent these results as the Commission, in consultation with the Attorney General, may determine.
 
 
 52
 It is apparent from a reading of the statute that had it been in effect when the Commission acted on the instant petitions this opinion would never have been written.
 
 
 53
 The foregoing language, however, cannot be found in the 1954 Act. That its omission was not one of neglect but of purpose is evidenced by the words of the chief proponent of the change, Joint Committee Chairman Cole. In the hearings on H.R. 8862, and S. 3323, (II Leg.Hist. 2131)[8] Chairman Cole, in addressing himself to the antitrust provisions of what was to be the new Atomic Energy Act of 1954, said:
 
 
 54
 the Atomic Energy Commission's responsibility was to run the Atomic Energy Commission, the Government activity in the energy field, and it was not the responsibility of the AEC to prevent, prohibit, or police antitrust operations. That is the duty and the statutory obligation of another agency of the Government, so it was for that reason that these references (in the 1946 Act) to the Commission's relationship to antitrust in the present (1954) law were eliminated.
 
 
 55
 That this was a purposeful omission is also borne out by a joint comment of Representatives Holifield and Price in which they stated that this bill (later to become the Atomic Energy Act of 1954) had certain 'major defects.' 'We believe,' the Congressmen declared, 'it is a mistake to relieve the Commission of the affirmative responsibility contained in the McMahon Act (of 1946), and deleted in this bill, to exercise its licensing authority in a manner to prevent the growth of monopoly or restraint of trade.' S.Rep.No. 1699, 83d Cong., 2d Sess. 105, 125 (1954); U.S. Code Congressional and Administrative News 1954, p. 3515 Section 105(c) of the Atomic Energy Act of 1954, 42 U.S.C. 2135(c) (1964), was most assuredly an attempt on the part of these (or other like-minded Congressmen) to inject antitrust principles into the Act. However, section 105(c) is patently restricted to section 103 licensing. In fact it could not apply to section 104(b) licenses until a section 102 finding of 'practical value' could be made. In effect then, the Commission is barred, with certain exceptions (such as 103 licensing), from considering affirmative anticipatory antitrust sanctions. In a colloquy between a member of the Joint Committee on Atomic Energy, Representative Holifield, and Mr. William Mitchell, General Counsel of the Commission in 1954, on the topic of section 105 of the new act and its general meaning, Congressman Holifield noted that the
 
 
 56
 section provides that the Commission may suspend, revoke, or take such other action as it may deem necessary after the court finding of monopoly.
 
 
 57
 I point out that this is 'after,' after the court finding of monopoly, and obviously not before the formation of a monopoly. I point out that it is permissive and not mandatory upon the Commission to take that type of action.
 
 Mr. Mitchell replied:
 
 58
 Yes, sir; that is right. I think our feeling would be that in a case of a finding of violation of law by a court, normally the court itself would take whatever action would be appropriate, but this (section 105(a)) provides for additional authority in the Commission.
 
 
 59
 II Leg.Hist. 2279-80.
 
 
 60
 These findings of course do not preclude the Commission from keeping an administrative eye on anticompetitive effects of the use of these facilities once they are constructed under section 104 (b). The Commission has the statutory obligation to report to the Attorney General any information it might receive 'with respect to any utilization of special nuclear material or atomic energy which appears to violate or to tend toward the violation of any of the (antitrust laws), or to restrict free competition in private enterprise.' 42 U.S.C. 2135(b) (1964).
 
 
 61
 Furthermore, the full statutory scheme set up by Congress makes it clear 'that Congress contemplated a step-by-step procedure. First an applicant would have to get a construction permit, then he would have to construct his facility, and then he would have to ask the Commission to grant him a license to operate the facility.' Power Reactor Development Co. v. International Union of Electrical, etc., Workers, 367 U.S. 396, 405, 81 S.Ct. 1529, 1534, 6 L.Ed.2d 924 (1961). From this it is also clear that these construction licensees must return to the Commission for authority to operate their new facilities.[9] At that point the Commission must determine whether the performance of other large-scale plants have demonstrated practicability (and thus commerciality) sufficiently to warrant an authorization under section 103. We warn the Commission that it has a most serious duty to perform at that stage, for if the trade has shown that these nuclear reactors are competitive in the commercial sense and it is clear that a commercial license is appropriate, then the Commission must consider, under section 105(c), anticipatory antitrust impact. Finally, under section 186(a), 42 U.S.C. 2236(a) (1964), the Commission has the power to revoke any type of license it has issued when there is a 'violation of, or failure to observe any of the terms and provisions' of the Act. This section invests the Commission with a continuing 'police' power over the activity of its licensees and provides it with the ability to take remedial action if a license is being used to restrain trade.
 
 
 62
 The petitioners also advance the argument that because the language of section 104(b) calls for compatibility with the regulations 'which would apply in the event that a commercial license were later to be issued pursuant to section (103),' the Commission is bound to apply the rationale of section 105(c) to its licensing under section 104(b). Essentially, the petitioners argue that this language expresses Congress' intent to provide anticompetitive protection to facilities which, at the outset, are experimental but which could become 'practical' and 'commercial' in the future. The error in this reasoning is that in interpreting the language of a statute the presumption that it means what it says must be given effect, absent patent conflict or ambiguity. The petitioners, in reading section 105(c) in the light of section 104(b), are attempting to make that language, clearly applicable to section 103 on its face, circuitously applicable to section 104(b) licensing. Chairman Cole recognized the difficulty in interpreting this qualifying language of section 104(b) and noted:
 
 
 63
 * * * I think it should be stated that it is not the intention of the authors of this bill that a license for research and development to prove out a type of reactor ever would ripen into a license for commercial use of that particular reactor, that after the type has been established to the satisfaction of the Commission as being acceptable in all respects, then the Commission opens up the field to applicants for licenses for commercial use of that type.
 
 
 64
 If a person having a license to conduct a research to prove out a type later wants to commercialize that thing, he must go back to the Commission and get the license, just the same as anybody else.[10]
 
 
 65
 It seems apparent from this language and from the letter of section 104(b) that Congress intended the Commission, in licensing under this section, to prevent conditions from arising which would tend to fix or freeze the applicant's status under section 104(b); rather, the Commission should promote conditions which will permit flexibility when the eventual finding of 'practical value' under section 102 leads the applicant to seek a commercial license under section 103. At that time the contentions here raised will certainly be both pertinent and reviewable. In essence, section 104(b) merely warns the Commission that today's experiment may be tomorrow's practice and that it should do nothing to impede that hoped-for eventuality.
 
 
 66
 In the reasoning of each of the petitioners in these cases we see a basic position constantly appearing in several facets of the argument. That basic position is that every agency charged with a licensing power must, when acting under a 'public interest' standard, apply antitrust concepts to everything it does which might involve anticompetitive results. Such reasoning is not without support in cases of this court. Last year, in Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968), we took the opportunity to develop our thinking on the relationship of the antitrust laws to agency regulation. There we declared our belief 'that the basic goal of direct governmental regulation through administrative bodies and the goal of indirect governmental regulation in the form of antitrust law is the same-- to achieve the most efficient allocation of resources possible.' 399 F.2d at 959. We further pointed out that while these two goals complement one another, 'the antitrust laws are merely another tool which a regulatory agency employs to a greater or lesser degree to give 'understandable content to the broad statutory concept of the 'public interest."' Id. at 961. However, what we did not touch upon in that case, and what is unique about the instant situation, is the extreme narrowness of the Commission's jurisdiction in making licensing determinations. Unlike the Federal Power Commission, the Federal Communications Commission, and the many other regulatory agencies, the Atomic Energy Commission is dealing with a subject matter that is not, as yet, open to vast commercial exploitation. These atomic power plants are not like radio stations of proven technical and commercial feasibility which are coveted prizes of the elite; instead, nuclear reactors are extremely speculative investments because of the many technical and financial imponderables. Unlike the other regulatory agencies, the Atomic Energy Commission concerns itself not with economic feasibility but with practical development and application of this wondrous source of energy. While the regulatory agencies in most of the other fields concern themselves with establishing an efficient national allocation of resources in the area which they are administering, and base this goal on a 'public interest' concept of free enterprise, the Atomic Energy Commission concerns itself with promoting technical innovation in a highly experimental field and implementing 'public interest' concepts through protection of the health, safety, and security of the nation.
 
 
 67
 The First Circuit recently addressed itself to the scope of the Commission's jurisdiction. In New Hampshire v. AEC, 406 F.2d 170, cert. denied, 395 U.S. 962, 89 S.Ct. 2100, 23 L.Ed.2d 748 (1969), that court upheld the Commission's refusal to consider as part of its regulatory concern thermal pollution of the Connecticut River by Vermont Yankee. The court, while affirming, did so 'with regret that Congress has not yet etablished procedures requiring timely and comprehensive consideration of non-radiological pollution effects.' 406 F.2d at 176. Moreover, as late as 1965, Congress reiterated, through its Joint Committee on Atomic Energy, that the Commission's regulatory control is 'limited to considerations involving the common defense and security and the protection of the health and safety of the public.' S.Rep.No. 390, 89th Cong., 1st Sess. 4 (1965). This kind of Congressional prescription of the Commission's regulatory jurisdiction cannot be overridden without risk that this court will exercise what Justice Black has described as 'super-legislative power.' Sniadach v. Family Finance Corp., 395 U.S. 337, 345, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). It seems clear, therefore, that the narrow construction of the Commission's jurisdiction must prevail at this time rather than the broader interpretation of power urged by the petitioners.
 
 
 68
 It might be helpful, in gauging the proper role of antitrust considerations in the Commission's activities, to ponder the future. A day may come when trains, television stations, airplanes, electric utilities, ships, and even food processing will be powered by the atom. When that day arrives, the Interstate Commerce Commission, the Federal Communications Commission, the Federal Aviation Administration, the Civil Aeronautics Board, the Federal Power Commission, the Department of Justice, the Federal Maritime Commission, and the Food and Drug Administration will be the regulators of their respective fields as they are today. It will be their duty to consider broad anticompetitive effects upon the entities which they regulate then, as it is their duty to do so now. Perhaps at that time there will be a Solar Energy Commission attempting to develop a new energy source with its eye on technology and safety rather than commercial reality.
 
 
 69
 Sections 105(b) and (c) direct the Commission to inform the Attorney General of any information the Commission might have which suggests anticompetitive practices arising out of the use of atomic energy. In the instant cases, a representative of the Attorney General from the Antitrust Division of the Justice Department was on the briefs for the respondents. Could it be that the 'watchdog' and the 'thief' have interests in common? In sum, the Commission was acting within the statute as properly interpreted. We therefore uphold the Commission on the issues of antitrust and jurisdiction.[11]
 
 
 70
 C. Propriety of Denying Piedmont Cities Power Supply, Inc. the Right to Intervene
 
 
 71
 In considering whether the Commission properly denied intervention of Piedmont in the proceedings below, we must first turn to the words of the Commission. 'Unlike the cities,' the Commission concluded, 'Piedmont has no existing economic interest related to the jurisdictional issue but only seeks to acquire such an interest. This interest claim * * * is a remote and tenuous one * * * and does not warrant a grant of intervention' (J.A. I 151). Section 2239(a) of Title 42 of the United States Code requires the Commission to 'admit any such person (whose interest may be affected by the proceeding) as a party to such proceeding.' Therefore, the clear expression of the statute requires us to uphold the Commission if its finding that Piedmont lacked a sufficient interest is reasonable and supported by substantial evidence.
 
 
 72
 Piedmont's interest, of course, is not directed at the issue of national health, safety and security which the Commission feels is the only proper consideration in a section 104(b) licensing proceeding. However, Piedmont does have an interest when one considers that it is urging the Commission to act under section 103. In other words, if the Commission had been convinced that it should have proceeded under section 103 then Piedmont's allegations regarding economic restraint would have been pertinent to the proceeding. It follows, then, that Piedmont had a significant interest in the section 104 proceeding-- namely, that the Commission was wrong in so proceeding.
 
 
 73
 The Commission did not base denial of intervention solely on this ground, however. It proceeded in its denial of intervention to say that 'we fail to see * * * how Piedmont was prejudiced in any practical way by its being denied intervention. * * * This identity of interest, position, and representation (with the 'cities') would indicate that the jurisdictional contentions which Piedmont sought to assert were, in fact, fully presented to the board and to us by its joint petitioners' (J.A. I 151). We are in complete agreement with the Commission on this point. Yet the petitioners argue that Piedmont had a right to intervene in the proceedings. This court has held that when a petitioner can show that it possesses a substantial interest in the outcome of the proceedings it has a right to intervene. However, an agency 'should be accorded broad discretion in establishing and applying rules for * * * public participation, including * * * how many are reasonably required to give the (agency) the assistance it needs in vindicating the public interest.' Office of Communication of United Church of Christ v. FCC,123 U.S.App.D.C. 328, 339-340, 359 F.2d 994, 1005-1006 (1966). Piedmont Cities Power Supply, Inc. is the handmaiden of the interests of these cities. It must follow that they can adequately protect Piedmont's interest. We can discern no substantial prejudice to Piedmont.
 
 
 74
 D. Propriety of Denying the Power Planning Committee the Right to Intervene
 
 
 75
 The question of intervention in the Power Planning Committee case is somewhat more difficult. As noted above, the Commission denied intervention to all of the petitioners on the ground that they 'in no way relate their interests to these matters or show how those interests will be affected by our determination on the radiological safety and national security issues in the proceeding' (J.A. II 95). It should be noted, however, that the Power Planning Committee's petition for leave to intervene failed to allege any impropriety on the part of the Commission in proceeding under section 104(b), and that the petitioners raised that issue only on appeal to the Commission. Consistent with our rationale in considering Piedmont's denial, we hold that the failure of the petitioners to timely raise this jurisdictional issue is fatal to their argument in this court. It must also be noted that even though the Commission refused intervention to the petitioners, it considered their arguments in passing upon the substantive issues of their complaint and gave adequate and reasonable treatment thereto.
 
 
 76
 Finally, the Commission has extended an opportunity to the petitioners in the Power Planning Committee to participate in the proceeding to determine whether Vermont Yankee qualifies financially under Part 50 of the Commission's regulations. At that time they will have full opportunity to air all of their contentions on antitrust principles and if they are unsuccessful before the Commission they can seek review in this court.
 
 
 77
 Basically, all of these problems hinge on a question of timing. At this time the field of atomic energy is experiencing scientific adolescence and the Commission is attempting to act as a watchful parent so that nuclear power will someday grow into a tractable adult. We recognize this role of the Commission and therefore affirm its action.
 
 
 78
 Affirmed.
 
 APPENDIX
 
 79
 42 U.S.C. 2132 (1964), 102 of the Atomic Energy Act of 1954:
 
 
 80
 Whenever the Commission has made a finding in writing that any type of utilization or production facility has been sufficiently developed to be of practical value for industrial or commercial purposes, the Commission may thereafter issue licenses for such type of facility pursuant to section 2133 of this title.
 
 
 81
 42 U.S.C. 2133 (1964), 103 of the Atomic Energy Act of 1954:
 
 
 82
 (a) Subsequent to a finding by the Commission as required in section 2132 of this title, the Commission may issue licenses to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, use, import, or export under the terms of an agreement for cooperation arranged pursuant to section 2153 of this title, such type of utilization or production facility. Such licenses shall be issued in accordance with the provisions of subchapter XV of this chapter and subject to such conditions as the Commission may by rule or regulation establish to effectuate the purposes and provisions of this chapter.
 
 
 83
 42 U.S.C. 2134 (1964), 104 of the Atomic Energy Act of 1954:
 
 
 84
 (b) The Commission is authorized to issue licenses to persons applying therefor for utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes. In issuing licenses under this subsection, the Commission shall impose the minimum amount of such regulations and terms of license as will permit the Commission to fulfill its obligations under this chapter to promote the common defense and security and to protect the health and safety of the public and will be compatible with the regulations and terms of license which would apply in the event that a commercial license were later to be issued pursuant to section 2133 of this title for that type of facility. In issuing such licenses, priority shall be given to those activities which will, in the opinion of the Commission, lead to major advances in the application of atomic energy for industrial or commercial purposes.
 
 
 85
 42 U.S.C. 2135 (1964), 105 of the Atomic Energy Act of 1954:
 
 
 86
 (a) Nothing contained in this chapter shall relieve any person from the operation of sections 1-13, 14-19, 20, 21, 22-27, 41-46 and 47-58 of Title 15 and sections 52 and 53 of Title 29. In the event a licensee is found by a court of competent jurisdiction, either in an original action in that court or in a proceeding to enforce or review the findings or orders of any Government agency having jurisdiction under the sections cited above, to have violated any of the provisions of such sections in the conduct of the licensed activity, the Commission may suspend, revoke, or take such other action as it may deem necessary with respect to any license issued by the Commission under the provisions of this chapter.
 
 
 87
 (b) The Commission shall report promptly to the Attorney General any information it may have with respect to any utilization of special nuclear material or atomic energy which appears to violate or to tend toward the violation of any of the foregoing sections, or to restrict free competition in private enterprise.
 
 
 88
 (c) Whenever the Commission proposes to issue any license to any person under section 2133 of this title, it shall notify the Attorney General of the proposed license and the proposed terms and conditions thereof, except such classes or types of licenses, as the Commission, with the approval of the Attorney General, may determine would not significantly affect the licensee's activities under the antitrust laws as specified in subsection (a) of this section. Within a reasonable time, in no event to exceed 90 days after receiving such notification, the Attorney General shall advise the Commission whether, insofar as he can determine, the proposed license would tend to create or maintain a situation inconsistent with the antitrust laws, and such advice shall be published in the Federal Register. Upon the request of the Attorney General, the Commission shall furnish or cause to be furnished such information as the Attorney General determines to be appropriate or necessary to enable him to give the advice called for by this section.
 
 McGOWAN, Circuit Judge (concurring):
 
 89
 Joining, as I do, in the opinion for the court, it seems to me both useful and important to emphasize that, in my view, the critical components of what we do are these:
 
 
 90
 1. It became clear on oral argument, if it was not so before, that the antitrust interest of petitioners derives far less from any desire on their part to be investors in capital construction than from their uncertainties as to the terms upon which power from the new facilities will be available to them for purchase if and when it appears that that power will be attractive in cost terms. Petitioners, thus, are not really opposed to the construction of the plants, but are apprehensive about the possible impact of the present ownership arrangements upon the future availability of power to themselves as customers. 2. What we hold on the record before us is that, consistently with the Congressional scheme, the Commission could (i) authorize the construction of these plants without presently exploring the basis of petitioners' antitrust apprehensions, and (ii) postpone an inquiry of this kind until the Commission comes to grips with the issue of whether the plants have commercial feasibility, which last is another way of saying that the power they generate will be attractive in cost terms to would-be purchasers like petitioners. 3. We do not think that petitioners will be effectively deprived of their opportunity to have the Commission examine into the basis of their fears about monopoly, since we assume, as does the Department of Justice, that operating authority must be sought forthwith whenever those fears have economic reality, i.e., when the Commission finds the plants to have commercial feasibility; and it will not be too late at that time for the issues now sought to be raised to be pursued and resolved.
 
 
 91
 LEVENTHAL, Circuit Judge, with whom Circuit Judges WRIGHT and ROBINSON join, concurring:
 
 
 92
 * I concur in the result and in the key ruling of the majority opinion, that although the permits to construct certain nuclear facilities have been issued under 104 of the Atomic Energy Act of 1954, as amended, the operating licenses must be issued under 103 of the Act if meanwhile the Commission concludes these facilities are of practical value for commercial uses.
 
 
 93
 This ruling means that most of the issues debated by the parties are not properly before us at this time, and that the comments on other issues in the majority opinion (and responsive discussion in this opinion) are dicta. The limited significance of our opinions today may be illuminated by setting forth the nature of this case as it originally seemed and as it took shape after oral argument en banc.
 
 
 94
 At the time rehearing en banc was ordered, the court was aware of the scope of the orders issued under the Atomic Energy Act of 1954, 68 Stat. 919, as amended, 42 U.S.C. 2011 et seq. (1964). The orders, issuing construction permits, approved to that extent the applications of the various intervenors for authority first to construct, and then to operate for 40 years on commercial sales, six light-water nuclear reactors, three of the boiling-water type, and three of the pressurized-water type, having an initial electrical power rating of some 5,161,000 kw (and a somewhat higher ultimate expected power level).[1] It appeared that the court was being asked by the Commission to affirm these permits, though they had been issued without any consideration of antitrust issues raised by petitioners, and though outstanding regulations contemplated conversion of the permits into the 40-year operating licenses without opportunity for consideration of such issues.
 
 
 95
 Petitioners are municipal electric utilities whose underlying complaint is against authority enabling private companies to operate these large facilities, and to take advantage of the Government's gigantic research and development expenditures in the field of nuclear energy, on terms alleged to be repugnant to the policies of the antitrust laws, permitting the private companies to dominate the power markets without any participation by the smaller municipal utilities.
 
 
 96
 A salient aspect of the overall controversy is that petitioners say the Commission erred in granting these construction permits under 104 of the Act, captioned 'Medical therapy, research, and development licenses,' which authorizes licenses 'for utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of practical value of such facilities for industrial or commercial purposes.' 42 U.S.C. 2134(b).
 
 
 97
 Instead, say petitioners, the authority should have been issued under 103 of the Act, captioned 'Commercial licenses,' 42 U.S.C. 2133. Section 102 provides that licenses are issuable under 103 whenever the Commission finds 'that any type of utilization or production facility has been sufficiently developed to be of practical value for industrial or commercial purposes.' 42 U.S.C. 2132.
 
 
 98
 The importance for present purposes of the differences between issuance under 103 and 104 is highlighted by the provision of 105, that a license cannot be issued under 103 until and unless the Commission has given the Attorney General notice of the proposed license, its terms and conditions. Section 105 continues: 'Within a reasonable time, in no event to exceed 90 days after receiving such notification, the Attorney General shall advise the Commission whether, insofar as he can determine, the proposed license would tend to create or maintain a situation inconsistent with the antitrust laws, and such advice shall be published in the Federal Register.' 42 U.S.C. 2135.
 
 
 99
 To justify the failure to notify the Attorney General the Commission stated that these reactors had not yet been shown to have practical value for industrial or commercial purposes.
 
 
 100
 Its reasoning, set forth principally in the Duke decision, reverted to a rulemaking proceeding which began in 1964, partly on the Commission's initiative, and partly on a request by the coal industry, wherein it considered whether certain types of light-water reactors were sufficiently developed to be of practical value for industrial or commercial purposes.
 
 
 101
 By that time the industry had passed the state when all the reactors were essentially prototypes, and had witnessed the signing of two contracts, pursuant to a 1962 Commission invitation, under the 'demonstration program,'[2] providing Government assistance to private utilities in the design, construction and operation of pressurized-water facilities in the 400-500 megawatt range.
 
 
 102
 In December 1963 Jersey Central Power Light Co. had announced plans for, and in due course it sought and obtained authority to build, without Government assistance, a boiling-water facility for a power level of 515 megawatts.
 
 
 103
 The 1964 notice of rule-making advised of a preliminary determination that 'practical value' involves both technical feasibility and economic considerations, namely competitiveness of nuclear power plant with conventional power plants in areas consuming a significant fraction of the nation's electrical energy.[3] On January 7, 1966, the Commission issued its determination,[4] as follows:
 
 
 104
 There has not yet been sufficient demonstration of the cost of construction and operation of light, water, nuclear electric plants to warrant making a statutory finding that any types of such facilities have been sufficiently developed to be of practical value within the meaning of section 102 of the Atomic Energy Act of 1954, as amended.
 
 
 105
 What Commission counsel aptly call the 'basic rationale' for this 1966 conclusion was stated as follows:
 
 
 106
 'Currently operable light water, nuclear electric plants range up to about 200 net MW(e) and are not economically competitive. In 1962 the Commission encouraged the construction of scaled-up plants by requesting authorization under the Power Demonstration program for plants in the 400-500 net MW(e) range. Operating experience, including maintenance and availability, from the plants for which Congress authorized appropriations in these intermediate sizes is not available, since none of them is completed. More recently, plants in sizes exceeding 600 net MW(e) are being designed and constructed without Government financial assistance. The Commission has examined in some detail whether the information provided by the award of contracts for the construction of scaled-up plants without Government assistance is sufficient to support, without further demonstration, a finding of practical value under the Act. Without the operating information the intermediate sized plants are expected to provide, we are not prepared to make a statutory finding on the basis of demonstrated results of the currently operable plants that plants at least three times larger than 200 net MW(e) are of practical value within the meaning of section 102.'
 
 
 107
 The focus of the Commission's rationale is the conclusion that it should await the operating information from the intermediate plants. In its Duke Power decision of January 3, 1968, the Commission adhered to the 1966 position, stating:
 
 
 108
 While two of the intermediate-sized plants have now been licensed for operation, essentially the same situation as regards 'demonstration' obtains today.[4]
 
 
 109
 Petitioners contend that this approach of the Commission embodies a requirement on degree of proof of cost competitiveness that is excessive and stultifies the purpose of the Act. They insist that a finding of practical value cannot reasonably be withheld, and a classification of 'development' rather than 'commercial' facilities maintained, when Duke Power is investing an estimated $341 million, an increase of about 1/3 of 1970 net utility plant, to add a nuclear plant capacity yielding some 2,600,000 kw, for an increase of 40% In capacity.[5]
 
 
 110
 Petitioners' briefs, filed in 1968, refer to various remarks of Dr. Glenn T. Seaborg, Chairman of the AEC, on the growth of nuclear electric power. Thus, on February 7, 1968, he stated, at the Governor's Industrial Safety Conference (AEC Release S-4-68):
 
 
 111
 In 1966 and 1967 more than one-half of the announced new steam generating capacity in the United States was nuclear-powered. We now have in operation, under construction and planned, a total of more than 85 nuclear power plants with a combined capacity of more than 60,000,000 kilowatts.
 
 
 112
 In the Duke opinion the Commission adverted to utility contract awards, noted that such business decisions had been before it at the time of its second rulemaking determination in 1966,[6] and concluded that now as then it adhered to the view that nevertheless a 'practical value' finding should await a reliable estimate of the economics based upon a demonstration of the technology and plant performance.
 
 
 113
 The Duke opinion quoted with approval a 1966 staff memorandum stating:
 
 
 114
 Although the willingness of utilities and equipment companies to accept the business risks involved is an impressive indication of the probabilities of successful operation at anticipated levels, it is not alone a sufficient basis to support a statutory finding of practical value by the Commission.
 
 
 115
 In support of the Commission's decision its brief also refers to this interrelated passage in the 1966 staff memorandum:
 
 
 116
 It is entirely appropriate for manufacturers and utilities to base their economic estimates on forecasts rather than to await substantial demonstration of cost once the basic technology has been proven; however, the staff considers that the Commission's statutory responsibility under section 102 of the Act requires more than strong belief that the next generation of plants will operate at anticipated costs.
 
 
 117
 The contentions of counsel in briefs filed in this court appeared to present a clash as to the intention of Congress which had to be decided by this court on the record before us. Was the Commission correct in saying that sales of reactors in the market place were not a legally sufficient basis to support a finding of practical value for commercial purposes? Did Congress require a cost demonstration from operation in addition to the 'strong belief' of experts based on proven technology and reasonable forecasts? Was it, indeed, possible to avoid forecasts in any such enterprise, and are not reasonable forecasts the very essence of administrative decision making for regulated industries? American Airlines, Inc. v. CAB, 89 U.S.App.D.C. 365, 192 F.2d 417 (1951).
 
 
 118
 The question arises whether it is within the genuine intention of the legislators that the Commission apply such an approach towards the making of the finding, when, as the Commission itself has advised Congress[7] -- this is 'a complex exercise' involving 'a mechanical distinction, which must necessarily be somewhat arbitrary, between classes of facilities'; the primary reasons in the statute for the distinction between developmental and commercial facilities have 'receded in importance' in view of the abundant supply of nuclear materials and the statutory amendments permitting private ownership. The finding was also intended as a 'mechanism' to discontinue further governmental assistance, but this is no longer being provided to light-water nuclear facilities.
 
 
 119
 Appellants contend that the protracted delay in making a finding, which has no practical significance so far as the Commission's own operations are concerned, amounts to a 'stultification' of the Congressional purpose, that its only substantial effect is to postpone Commission consideration of the antitrust laws, that this is a practical problem of business restraints for which the unusually rigorous approach of the Commission is inappropriate, and in effect means that the Commission is waiting until the horse is stolen and abdicating its duty to lock the barn beforehand.
 
 
 120
 However, it developed at the oral argument en banc that the underlying controversy between the parties presenting these broad issues (and others) was not necessarily to be resolved on the present record and at the present time and that it might be dissipated without need for resolution by the court, or might take a significantly different shape when the time came for court resolution.
 
 
 121
 A notable feature of the presentation by petitioners was this: that their legal contentions, if sound, required the termination of the authority of intervenors to construct the facilities, yet petitioners did not in fact want this construction stopped. The relief they really desired was the setting of protective terms and conditions governing the authority of intervenors to operate the facilities once constructed.
 
 
 122
 However, the conditions appropriate for operating authority are not necessarily for determination on application for a construction permit. Under the statute's step-by-step procedure, an applicant who constructs a facility with authorization must return to seek a separate license to operate the facility. Power Reactor Development Co. v. International Union of Electrical, etc., Workers, 367 U.S. 396, 405, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).
 
 
 123
 Moreover, the key information which the Commission stressed in its 1968 Duke decision as needed for a finding of practical value was the operating information of the two intermediate-sized plants, in the 400-500 megawatt range, which had been 'licensed for operation within the past year.'
 
 
 124
 Commission counsel conceded, and indeed emphasized (Br. 36)--
 
 
 125
 Nothing in the Commission's earlier Section 102 determinations or in its Duke Decision indicates that a finding of 'practical value' as to plants in the 800-1100 net MW(e) range (the range of the Oconnee reactors) must await operating experience from plants that large.
 
 
 126
 The question arises, how long would be required for the Commission to make a determination as to practical value that took into account operating experience from intermediate-sized plants?
 
 
 127
 Commission counsel advised that this could be done during, say, 1970, at any rate well in advance of the issuance of licenses to operate the facilities involved in the construction permits under review.
 
 
 128
 Petitioners were concerned by provisions of the Commission's regulations[8] which announced, and might be taken to have made a commitment, that on conversion of a construction permit issued under 104 the Commission would not interpolate 103 as the basis for the operating license. Such a procedure, if sound, would indeed compel intensive litigation at the construction threshold.
 
 
 129
 The key ruling of the court endorsed by all its members, makes it clear that in the event of an intervening conclusion of the existence of practical value, the statute requires that operating license be issued under 103.
 
 
 130
 As one of the utility intervenors put it at argument, the construction permit is in effect an intermediate proceeding to be repeated when the operating licenses are issued. The utilities expressly disclaimed any contention that they had a 'vested right' to use of 104 in consideration of their applications for operating authority.
 
 
 131
 The majority opinion is quite right in stressing the importance of care in the further proceeding. The Commission has deferred, but it cannot avoid, its statutory responsibility in the matter before us.[9] Whichever way the issue is decided, the Commission must make a reassessment of the issue of the practical value of the facilities involved, and determine whether 103 or 104 is the proper predicate for its action before issuing operating licenses to petitioners. This is, of course, subject to change if Congress amends the law, as the Commission has urged, to remove the provision for a determination on practical value in view of the fact that it no longer serves any purpose with regard to allocation of scarce resources or the provision of Government assistance. (See text accompanying note 7 supra.)
 
 
 132
 It has always been recognized that nuclear energy has least competitive appeal for areas with coal mine mouth plant sites and direct access to natural gas locations.[12] It presumably has greatest 'practical value' in areas where fossil fuels have highest delivered costs. Yet there may be 'practical value' in nuclear-electric energy and these light-water facilities in a zone that is limited, provided it is not commercially insignificant.
 
 
 133
 Since the controversy between and among the parties properly awaits final resolution in the light of an amplified record, comments concerning the shape of that resolution are in the realm of dicta.
 
 
 134
 However, some of the expressions in the majority's dicta seem unduly influenced, tipped to the point of tilt, by the fact that technical expertise is involved in the issues before us. It is not correct that decision of these issues is to be dominated by the experts subject to the sole condition that they must speak clearly and seem reasonable. They must also carry on their functions so that they do not stultify the intention of Congress.
 
 
 135
 A court's respect for an agency's technical expertise, sound and proper in its place, leads to distortion and error unless the court is ready and vigilant to disentangle the threads of a composite determination. There is chore and challenge for the court in its duty to sort out the strands of decision that go beyond the realm reserved for the expert, and constitute a general standard or approach that falls within the domain of policy of the agency and within the domain of law for consideration by both the agency and ultimately the court.
 
 
 136
 It was the undue influence of technical expertise that beset our opinion in Volkswagenwerk Aktiengesellschaft v. FMC, 125 U.S.App.D.C. 282, 371 F.2d 747 (1966). Giving 'due deference to the expertise of the Commission,' we found substantial evidence in the record to support the decision of the FMC. The Supreme Court, in reversing, admonished us that where the issue is not strictly the sufficiency of evidence but involves the application of a statute, the responsibility is on the court, as the final authority, to avoid frustration of the congressional policy underlying the statute, Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). The Court reiterated (see 390 U.S. at 272, 88 S.Ct. at 935): 'The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia.' There, as here, the agency resorted to a narrow construction of the statute that operated to reduce the number and variety of matters requiring attentive consideration in the light of harmony with the policies of the antitrust laws.
 
 
 137
 It would be very much a task for the court, to pursue with vigilance, to determine whether on the amplified record the Commission was stultifying Congressional intent by adopting an onerous and excessively rigid approach to the issue whether the facilities had 'practical value.'
 
 II
 
 138
 The majority opinion seeks to enhance the construction permit rulings by referring to certain post-1967 and post-record items reported in the press. The matter is not momentous, since resolution of the real controversy awaits future shaping of the record. But it may merit a word to note the objections to use of this kind of private business hearsay in judicial opinions, on matters that are not conceded and may well be subject to probing on pointed questioning
 
 
 139
 Moreover, and more important, the determination of 'practical value' does not depend on or require a computation that nuclear power will continue in the future as in the recent past to account for the bulk of annual increments to power capacity. It is enough if the technology and fundamental economic considerations make it clear that there is a role for light-water nuclear facilities that is not lacking in commercial significance.
 
 
 140
 The Commission always recognized that the unprecedented surge of nuclear power orders of the mid-1960's, which gained momentum with the success of operating experience with smaller reactors, would taper off.mmmmmmmmm Commission report for 1968, issued in January 1969, points out various considerations pertinent to the plateau which has been established. The nuclear economic climate is one 'where virtually all activities are in the commercial-industrial shpere of the Nation's economy.' The lead time between ordering and operating is longer for nuclear plants than for fossil-fueled plants. With considerable orders in hand for larger plants, in the 800 Mwe and 1,000 Mwe class, there is a natural pause to await operating status, confirming design efficiency, and the solution of large and small problems that are inevitable for any new industrial endeavor. Yet this pause does not negative the fundamental fact of the extent of commercial nuclear power. 'At year's end (1968), there were 44 nuclear power units under construction and nearly all of these are scheduled to be in operation over the next 5 years.'[11]
 
 
 141
 A light-water nuclear plant whose technical efficiency is generally verified by operating experience of intermediate plants is not to be stripped of all practical value even assuming a large number of utility executives estimate that at the present moment greater value may reside in other types of plants.
 
 
 142
 Determination of the economics of fuel competitiveness is too dynamic a process, involving too many shifting factors, to presume that any exact finding could have been intended by 102. Indeed, any exact calculation woudl in part be an exercise in 1969 current events, taking into account, e.g.-- the crossing of theNorthwest Passage as bearing on, say, a utility prediction that the recent favorable price performance of residual fuel oil will be strengthened with the prospect of Alaskan reserves; the dramatic rise and the persistence of high interest rates and likely repeal of the investment tax credit, as adverse to unusually capital-intensive projects like nuclear plants.
 
 
 143
 Nor could the calculation be strictly economic. It would have to consider the many faces of anti-pollution policy. And commercial significance in the ordering of large light-water plants is not gain-said by awareness either that the demand was partly ascribable to a long-range calculation of the ultimate benefit available from acquiring nuclear experience,[13] or that further light-water experience will be balanced against the possible emergence of the breeder reactors much discussed in the Commission reports.
 
 
 144
 The finding of practical value may in a way be simplified rather than complicated by the vast number of unknowns and unknowables, since in an industry confronted with steeply rising electric energy demand curves it is enough to conclude that there is a likely place that it is not insignificant for nuclear power and these facilities, even though the contours cannot be exactly delineated.
 
 III
 
 145
 Since the actual controversy between the parties relates to the operating license, and since that license may be issued under 103, the case does not warrant a hypothetical appraisal of how the situation might stand if the operating license issues were issued under 104.
 
 
 146
 If such reflections are to be indulged, I see no sound basis for an intimation that the Commission is absolutely prohibited from taking antitrust considerations into account in fashioning reasonable terms and conditions for an operating license under 104.
 
 
 147
 The ability of theCommission to afford fresh consideration when the time arrives for issuance of operating licenses, and to consider all pertinent matters involved in the light of further data and experience, constitutes one of the salient features and principal virtues of the administrative process.[14] Consideration of antitrust issues in the light of the experience and scientific data available at that time may be of value in solving concrete, practical problems.
 
 
 148
 The decisions of the Supreme Court and this court over a period of at least 25 years have evolved and defined a substantial jurisprudence making clear that the administration of federal regulatory statutes calling for determinations of the public interest establish the authority, and in some instances the duty, of the cognizant agency to take into account what has been aptly called the nation's 'fundamental national economic policy,'[15] namely the principles of the antitrust laws. FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 243-246, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968); Denver and R.G.W.R. Co. v. United States, 387 U.S. 485, 492-493, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967); California v. Federal Power Comm., 369 U.S. 482, 484-485, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); United States v. Radio Corporation of America, 358 U.S. 334, 351-352, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); McLean Trucking Co. v. United States, 321 U.S. 67, 79-80, 64 S.Ct. 370, 88 L.Ed. 544 (1944); National Broadcasting Co. v. United States, 319 U.S. 190, 222-224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (7/30/69); Northern Nat. Gas Co. v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 ,. f2d 741 (1956). These opinions fully recognize that a regulatory agency has neither a duty to administer the antitrust laws as such nor a mandate to apply their dictate. Furtherance of the economic or policy implications of the agency's particular statutory charter may indeed compel overriding of antitrust principles. But enforcement of the basic statute does not compel unawareness of antitrust policies, and the agency may well be able to harmonize diverse and even competing policies. McLean Trucking Co. v. United States, supra; cf. Southern S.S. Co. v. NLRB, 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); Northern Nat. Gas, co. v. FPC, supra , 130 U.S.App.D.C. at 226-228, 399 F.2d at 959-961.[16]
 
 
 149
 It is a fair synthesis of the cases that a statute providing for licensing or other regulation is presumed to permit consideration of antitrust principles, with the harmonizing approach just outlined, unless a contrary intent appears expressly or by necessary implication. No intent to disregard the antitrust principles appears in the Atomic Energy Act.
 
 
 150
 On the contrary, the general finding of 2, that nuclear utilization facilities 'are affected with the public interest,' is combined with declaration of policy set forth in 1(b) that development of atomic energy 'shall be directed so as to * * * strengthen free competition in private enterprise.' And 3 provides that it is the purpose of the act to effectuate the policies set forth in 1, by providing for-- 'd. a program to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes to the maximum extent consistent with the common defense and security and with the healthe and safety of the public.'
 
 
 151
 We turn now to section 105, which deals particularly with the antitrust laws. Subsection (a) permits revocation of licenses of those found to have violated the antitrust laws. This plainly does not negative, if anything it affirms, the authority to consider antitrust issues before licenses are issued. National Broadcasting Co. v. United States, supra, 319 U.S. at 222, 63 S.Ct. 997; Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950). Subsection (b) directs the Commission to report to the Attorney General any information that it may have as to use of atomic energy which appears to violate or to tend toward the violation of the antitrust laws, or to restrict free competition in private enterprise. The fact that the Department of Justice may correct antitrust violations that emerge after licenses are issued does not negative a pre-licensing role for theCommission to avoid antitrust problems.
 
 
 152
 The antitrust objectives of the Act are not merely pious phrases devoid of practical significance. The Commission is attentive to their importance, and has begun a joint study with the Department of Justice.[17] The more regrettable, then, is the agency's conclusion, which to me seems unsound, that the Act prohibits review of antitrust problems during the consideration of whether to issue a license, and on what terms, even though the agency has a strong belief in commercial practicability and awareness of large amounts of commerce in fact, merely because the data do not impel it to make a formal finding of practical value and hence the license is issued under 104.
 
 
 153
 The propriety of Commission consideration of antitrust policies is so strongly indicated by both well-settled general principles for construction of regulatory statutes and the particular objectives of this Act that one is led to inquire on what basis the Commission has come to conclude that it is forbidden to consider the objective of promoting free competition in the issuance of licenses under 104.
 
 
 154
 The Commission claims to find this conclusion in 105(c) of the Act, and I think improperly. Section 105(c) provides that before a license may be issued under 103 the Commission must notify the Attorney General, and he must advise whether 'the proposed license would tend to create or maintain a situation inconsistent with the antitrust laws.' The absence of such a direction and condition as to licenses under 104 is said to prohibit consideration of these issues.
 
 
 155
 What is the significance of 105(c)? This is a procedural section, which sets forth no substantive standards. Even in cases coming under 105(c) the substantive propriety of considering antitrust principles is derived not from 105(c) and its procedural mechanics, but from the fundamental objectives of the Act, including 1, 2 and 3, and the general doctrines, already discussed, making plain the propriety of consideration of antitrust principles in harmonizing Congressional objectives-- in the absence of a contrary indication in a specific statute.
 
 
 156
 Section 105(c) interposes an unusual mandatory procedure. The Commission must seek the advice of the Attorney General, and the Attorney General must not only render but also publish his advice. The lack of any such unusual usual procedural requirement for 104 licenses does not negative the substantive authority of the Commission, derived from general principles as reinforced by the objectives of this Act, to give heed to antitrust principles, and the promotion of free competition and widespread participation, to the extent these may be harmonized with the Commission's particular concerns under this Act, such as assurance of safety.
 
 
 157
 The Commission would not be required to give consideration to antitrust problems with regard to all 104 licenses. Indeed, even as to 103 licenses it is provided in 105(c) that the Commission is not required to notify the Attorney General concerning 'such classes or types of licenses, as the Commission, with the approval of the Attorney General, may determine would not significantly affect the licensee's activities under the antitrust laws.' The Commission could properly make a similar determination that certain types of 104 licenses would probably not significantly invoke antitrust problems. It could make this determination without being required to obtain the advance approval of the Attorney General, since his advice is not required as a condition to issuance of approval of 104 licenses. The Commission might well determine that purely experimental prototype facilities would be so unlikely to present significant antitrust problems that as a matter of efficient administration it would decline consideration of antitrust issues with respect to licenses for prototype facilities.
 
 
 158
 This case, however, involves a class of facilities far outside the prototype classification. This is a class of facilities tried out in a not insignificant range, with results that have led businessmen to establish a substantial volume of commerce on their assessment of merit under the standard of sound business risks. Although the hypothesis is that they are still validly classified as 'developmental,' they involve such a stream of commerce that it is unlikely that the agency would find, or that Congress would expect the agency to find, that the entire class of facilities was such as to be unlikely to involve antitrust problems. And I do not believe that there is sound basis for concluding that the Congress required the Commission to license vast business operations strongly believed to be of practical value by Commissioners and staff as well as those making staggering investments, without any authority to avoid, as by inserting reasonable conditions, the onset of undue restraints in the activities receiving operating licenses.
 
 
 159
 What is shown by the legislative history discussed in the majority opinion? The 1954 act dropped 7(c) of the 1946 act. But 7(c) of the 1946 act positively directed the Commission to refuse licenses 'where activities under any license might serve to maintain or foster the growth of monopoly.' In contrast the 1954 act permits the issuance of licenses, notwithstanding anti-competitive restraints, where appropriate to achieve other purposes of the legislation.[18] In short the 1954 act leaves this Commission in the same position as the other regulatory agencies, of being free to override antitrust issues because of a paramount objective of the particular law.
 
 
 160
 The same applies to Rep. Cole's observation to a witness in the 1954 hearings that the change from 7(c) of the 1946 act was made in order to make clear that 'it was not the responsibility of the AEC to prevent, prohibit, or police antitrust operations. That is the duty and the statutory obligation of another agency of the Government.'[19] Rep. Cole's observation does not mean the agency was prohibited from considering antitrust issues, for if that were so it would apply to 103 licenses.
 
 
 161
 The true meaning of Mr. Cole's comment is discerned by reviewing what he rightly noted: The 1946 act had gone very far-- far beyond any other regulatory statute-- in directing, in requiring, the Commission to deny any license if activities thereunder might foster monopoly. That languange did make it the responsibility and duty of the Commission to make a monopoly or antitrust determination. The repeal of 7(c) placed the Commission in the same position as other agencies. As the principles and cases cited above make perfectly clear,[20] those agencies do not have a responsibility to define, apply, or police the antitrust laws as such. They may override the antitrust laws where necessary to carry out their purposes. Yet that does not mean that they may not give consideration to antitrust matters and seek to harmonize the multiple objectives.
 
 
 162
 The removal of 7(c) of the 1946 law removed a stringent mandate and gave flexibility to the Commission-- like that possessed by other regulatory agencies-- as to how to achieve the accommodation of the objectives of the particular statute and broaden antitrust principles. This was in accord with President Eisenhower's message of February 17, 1954,[21] that harnessing of atomic power required changes in the 1946 law to strengthen competitive enterprise and promote flexibility of regulation:
 
 
 163
 But, in this undertaking, the enterprise, initiative, and competitive spirit of individuals and groups within our free economy are needed to assure the greatest efficiency and progress at the least cost to the public. In order to encourage the greatest possible progress in domestic applications of atomic energy, flexibility is necessary in licensing and regulatory provisions of the legislation.
 
 
 164
 I see the 1954 act as removing the shackle of a rigid substantive requirement and according the same flexibility as that of other agencies in harmonizing antitrust and other statutory objectives, a flexibility that would prevent use or application of the Federal license to thwart or abort the broad competitive atmosphere sought by the President. The majority opinion reads the statutory change as achieving not flexibility, but as replacing one inflexibility with another, and ensuring the inflexibility of blinders blocking out all awareness of the implications for competitive enterprise. In my view this wholly misreads and distorts the statute's purposes and history.
 
 
 165
 No consequence of prohibiting consideration of antitrust principles can be ascribed either to this change from 7(c) of the 1946 act, or to the other legislative observations noted in the majority opinion.[22] If they indeed have the consequence noted in the majority opinion, they would also prohibit consideration of antitrust matters in connection with 103 licenses, or prohibit the provision of 103 conditions in order to avoid abuse of the license through unreasonable restraints on competition. Such a result is not contended for by the Commission, the Attorney General or the intervenors, and seems plainly contrary to the Act.
 
 
 166
 The question relates to the possibility that the Commission may come to consider issuance of operating licenses under 104 for cases where a considerable commerce is already underway due to a widespread acceptance of business risks. It is wrong, in my view, to announce dicta that assume that the objective of strengthening free competition, prized by the President and Congress generally and affirmatively restated as a purpose of this very Act, was somehow completely removed from consideration for purposes of 104 licensing merely because 104 is not subject to the mandatory procedure inserted as to 103 licenses in order to require what the Attorney General described as 'an effective means to insure that knowledge of possible antitrust difficulties' (supra, note 18), and because flexibility has been provided for both 103 and 104 by removing the stringent standard of former 7(c), which virtually required the AEC to enforce the antitrust laws.
 
 IV
 
 167
 Since the controversy between the parties will really take shape, if it is not settled by agreement, in connection with the operating lecense application, I see little point in probing the ruling denying intervention to the Power Planning Committee of the Municipal Electric Association of Massachusetts on the hearing, held on notice, on whether a construction permit should be given to Vermont Yankee Nuclear Power Corp. of the building of a boiling-water reactor.
 
 
 168
 The intervention would, in my view, be clearly proper on the application for an operating license. Obviously the Commission has not yet held to the contrary-- since it may well be either conducting that proceeding in accordance with 103 (and 105c), or be considering which section is applicable.
 
 
 169
 The Commission has apparently taken the position that if a proceeding is structured as arising only under 104 an intervention on antitrust grounds may never properly be maintained. If that position is retained in connection with the application for an operating license it would, in my view, result in reversible error productive of mischief and delay. Hopefully this court will not have to consider that issue.
 
 
 170
 BAZELON, Chief Judge (concurring in part and dissenting in part):
 
 
 171
 The Atomic Energy Commission disclaims jurisdiction to consider the antitrust issues raised by the municipal utilities.[1] By construing 103 to require proof of practical value well beyond a reasonable doubt, the Commission confines its review of these nuclear reactors to safety and defense matters under 104. Hence, huge power plants that are commercial by any standard but the agency's are classified as research and development projects and therefore exempt from the prior antitrust review required for commercial projects by 105(c) of the Act.
 
 
 172
 Duke Power Company was granted a research and development permit to build three nuclear reactors in Oconee County, South Carolina. With their designed capacity of 2,600,000 kilowatts, the reactors will meet about one third of Duke's anticipated demand when completed. Duke's estimated investment in the project is $341,000,000.
 
 
 173
 In the Massachusetts case, ten privately-owned utilities, apparently the major New England private utilities, have formed a joint venture, Vermont Yankee Nuclear Power Corporation, to construct and operate a nuclear reactor at Vernon, Vermont. Its expected power capacity is 1,665,000 kilowatts. Total capital requirements are estimated at $123,000,000. The financial arrangements were approved by the Securities and Exchange Commission, upon a showing that the Vermont Yankee project is expected to produce power at a cost lower than conventional power plants.[2] This project, too, has been licensed by the Commission as a demonstration model.
 
 
 174
 In a rulemaking proceeding three years ago and again in the decisions at bar, the Commission declined to make a finding of practical value for this type of boiling water nuclear reactor on the ground of insufficient evidence that such nuclear projects would be economically competitive with conventional power sources. The Commission noted that small nuclear reactors in the 200 megawatt range did not produce power at competitive costs and that intermediatesized plants with a 400-500 megawatt capacity were not yet operative. It concluded that without information from these intermediate-sized plants, it could not hazard a finding of practical value for still larger plants. 31 Fed.Reg. 221 (1966).
 
 
 175
 The Commission's reasoning has a nice ring in the abstract, but the result is at odds with the facts. These nuclear plants are designed for regular commercial service. They are financed entirely by private capital without government subsidy; indeed, private investors have staked nearly half a billon dollars on the commercial success of the plants in these cases alone. The Commission concedes that the basic technology has been proven and that these projects are subject to no more than 'reasonable business risks.' 31 Fed.Reg. at 224. None-theless, as a result of the Commission's peculiar standard, these plants are officially still not of practical value.
 
 
 176
 The Commission maintains that its 'statutory responsibility' requires more than 'strong belief that the new generation of nuclear plants will operate at anticipated costs,' 31 Fed.Reg. at 224, but cites nothing in the statute to compel this cautious pessimism.[3] The Commission stated in the 1966 ruling that the consequences of a practical value determination were 'relatively narrow.' They were principally to require consideration of a commercial project's impact on what was once thought to be a scarce nuclear fuel supply and to make commercial projects ineligible for further government assistance. By 1966 nuclear fuel was not scarce; and projects like and including the Oconee and Vermont Yankee reactors are not receiving subsidies. /4/ Thus, in practice the only substantive consequence of the Commission's reluctance to find practical value has been to excuse the Commission from considering the antitrust implications of all nuclear projects licensed to date.[5] $5Is there any reason why a practical value finding should await evidence that nuclear plants are subject to something less than 'reasonable business risks?' Since the main result of the agency's stiff standard of proof is to make antitrust considerations irrelevant to its licensing responsibility, perhaps the Commission thinks these questions are premature. This is a dubious explanation, however, since under the Commission's Rules answers to antitrust questions could be delayed indefinitely, regardless of an intervening finding of practical value.[6] I concur fully in the majority's implicit interdiction of this possibility.[7]
 
 
 177
 If there are reasons for the Commission's procrastination, the agency has not offered them. I have no quarrel with the showing that Congress intended to limit 105(c) to commercial licensing proceedings. As a common sense matter, a reasearch and development project does not portend an immediate and substantial impact on competition. But nothing in the legislative history suggests that Congress intended much of the country to be lit and powered by nuclear research and development projects, licensed without the antitrust review required by the Act.[8] The Commission claims to be bound by the statute. Nothing in the Act requires that practical value mean absolute certainty of commercial success. When an agency's reading of a term of its governing statute virtually nullifies one of its substantive provisions, the interpretation is not entitled to the usual deference.
 
 
 178
 Nor is the gap filled by the bare invocation of the Commission's expertise. Certainly nuclear engineering is a technical subject, but it is not clear that the Commission is better equipped than the industry and the financial community to judge the commercial prospects of these nuclear plants,[9] once the technology has been proved, as the agency assures us it has. Normally, I would vote to remand these cases to the Commission, but the situation has changed since these appeals. At the oral argument, counsel for the Commission announced that a new rulemaking proceeding on the question of practical value would be commenced within one year. Since reconsideration is forthcoming in time to affect these projects, there is no need for further proceedings in these cases.
 
 
 179
 In the interim, there may be new legislation to change or clarify the Commission's conflicting roles. The agency has served as an aggressive and effective salesman for nuclear power, hastening its commercial development. But when nuclear facilities reach the point of practical value the Commission acquires new regulatory duties under the statute. The tension between its roles as promoter and potential regulator of nuclear facilities may account for its ofter irreconcilable statements on their commercial prospects. We may hope that the agency's duties or its statements will be harmonized before another of these cases comes to court.
 
 
 180
 KILOWATTS
15 operable 3,851,700
48 under construction 37,689,200
32 planned (reactors ordered) 28,375,000
 9 planned (reactors not ordered) 8,455,000
 ----------
 78,370,900
 
 
 
 [1]
 Dates, numbers, weights and equivalents were taken from the Encyclopedia Britannica, 1968 ed
 
 
 [2]
 There are two Joint Appendices in these cases. The Joint Appendix in No. 21,706 will be hereinafter referred to as J.A. I; the Joint Appendix in No. 21,844 will be referred to as J.A. II
 
 
 [3]
 10 C.F.R. 50.12 (1969) provides that 'the Commission may, upon application by any interested person, grant such exemptions from the requirements of the regulations in this part as it determines are authorized by law and will not endanger life or property or the common defense and security and are otherwise in the public interest.'
 
 
 [4]
 The Atomic Safety and Licensing Board was appointed in compliance with 42 U.S.C. 2241 (1964)
 
 
 [5]
 The Commission set December 8, 1968, as the cut-off date by which information had to be filed by all interested parties to enable the Commission to determine the financial qualifications of Vermont Yankee, providing in its order that the date could be extended for good cause shown. (J.A. II 105.) It is assumed that the petitioners herein have submitted all data relevant to the question of whether the financial arrangements violate the spirit of the antitrust laws. The determination will, of course, be subject to independent judicial review
 
 
 [6]
 The Wall Street Journal, Nov. 7, 1968, at 19, col. 2. See also The Washington Evening Star, June 16, 1969, at C-5, col. 6-- where there appears an article noting that Duke Power Co. plans a $6 million 'coal-fired' generator to be built by 1972 and The Wall Street Journal, May 6, 1969, at 5, col. 2-- where it is noted that Duke Power plans a $289 millon coal powered plant for 1974 because of 'the importance of bringing this generating into service on schedule and in view of the higher risk of regulatory delays associated with nuclear (power). * * *'
 
 
 [7]
 See, e.g., FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 244, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968); McLean Trucking Co. v. United States, 321 U.S. 67, 79-88, 64 S.Ct. 370, 88 L.Ed. 544 (1944); Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968)
 
 
 [8]
 The complete legislative history of the 1954 Act was compiled by the Commission's staff in 1955 in a three-volume set known as Legislative History of the Atomic Energy Act of 1954, both here and hereinafter cited-- Leg.Hist.--
 
 
 [9]
 This seems to be the position of the Department of Justice also. In respondents' brief in Cities of Statesville at 39 n. 44, it is stated that
 It is the view of the Department of Justice that once a determination of practical value has been made for a type of facility, the Commission is required by the Act to conduct the operating license proceeding for a facility of the type under Section 103 even though a construction permit for the facility was issued under Section 104(b).
 
 
 [10]
 II Leg.Hist. 2276-77; see also pp. 970-971 supra
 
 
 [11]
 This holding in no way supports the viewpoint of the Commission that untimely filing of protests raising antitrust questions waives consideration thereof. Where the Commission is charged with the duty of weighing these considerations it cannot discharge that duty through procedural gymnastics
 
 
 [1]
 Duke Power Company was authorized to build three pressurized light-water reactors (Oconee Units 1, 2 and 3), each with an initial rating of 839 electrical megawatts. Vermont Yankee Nuclear Power Corp. was authorized to build a boiling-water reactor with an initial power rating of 514 electrical megawatts. Philadelphia Electric Company (together with three co-venturers) was authorized to build two boiling-water reactors, each having an initial power rating of 1065 electrical megawatts. These ratings relate to the electrical energy to be produced by turbine generators supplied with steam created by the heat derived from atomic fission. In the pressurized-water reactors the use of pressure permits the water to attain high heat levels without boiling
 
 
 [2]
 The program was formalized in the Act as the Co-operative Power Reactor Demonstration Program, see 261 (42 U.S.C. 2017). The contracts were executed with the Connecticut Yankee Atomic Power Co. for a 490,000 kw plant, and also for the earlier-proposed San Onofre project for 395,000 kw facility. Licenses were issued under 104b for construction and then for operation
 
 
 [3]
 Notice of July 10, 1964 (29 F.R. 9458)
 
 
 [4]
 Determination Regarding Statutory Finding of Practical Value, 31 F.R. 221, Jan. 7, 1966
 
 
 [4]
 The Connecticut Yankee Atomic Power Plant and the San Onofre Nuclear Generating Station, both in the 400-500 net MW(e) range, were licensed for operation within the past year. The former has very recently been brought to full power operation and the latter is approaching that stage. The Oyster Creek plant of the Jersey Central Power & Light Company, the first of the plants in sizes exceeding 600 net MW(e) which has been licensed for construction, has not been completed as yet. (AEC footnote)
 
 
 [5]
 Duke's application shows a net utility plant system of $737 million for 4,834,000 kw as of 1966, plus $124 million slated for the addition of 1,393,000 kw for completion in 1967-1970
 
 
 [6]
 The Commission there denied a 1966 petition which sought the same relief as that sought by the petition filed in 1964. and called attention to announcements by utilities of orders for light-water reactors. Notice of Denial of Petition for Rule Making, Dec. 30, 1966, 31 F.R. 16732
 
 
 [7]
 Communication of August 29, 1966, from AEC to Chairman of Joint Committee on Atomic Energy, transmitting 'Responses to Questions Relative to Statutory Determination of Practical Value.' Hearings on Licensing and Regulation of Nuclear Reactors before the Joint Committee on Atomic Energy, 90th Cong., 1st Sess., Part 2, Appendix 5, p. 906ff
 
 
 [8]
 10 C.F.R. 50.23, 50.24, 50.56 (1969 ed.)
 
 
 [9]
 In this connection, AEC Commisioner Ramey testified at Joint Committee hearings on April 30, 1968, that the Commission would 'come to grips' with the practical value question probably within the next two years. Hearings on Participation by Small Electrical Utilities in Nuclear Power before the Joint Committee on Atomic Energy, 90th Cong., 2d Sess., Part 1, p. 30 (1968)
 
 
 [10]
 See, e.g., 'Report on the Nuclear Industry, 1967' (AEC, Govt.Print.Off.) pp. 81-82
 
 
 [11]
 'Major Activities in the Atomic Energy Programs,' (AEC, Jan. 1969) at 3
 
 
 [12]
 1967 Report, supra note 10, at 77
 As noted in the majority opinion (note 2), on July 22, 1969, subsequent to the oral argument en banc, the Commission gave notice that it would initiate a rule-making proceeding by June 30, 1970.
 
 
 [13]
 Compare 1967 Report, supra note 10, referring (p. 76) to 'the need for utilities to develop in-house nuclear capabilities on a timely and thorough basis.'
 
 
 [14]
 Compare Pike's Peak v. FCC, 137 U.S.App.D.C. 234, 422 F.2d 671
 
 
 [15]
 Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 218, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966)
 
 
 [16]
 The opinion in Northern Natural begins, in Part A, by examining 'the overall relationship between antitrust law and regulatory agencies.' It points out: 'The basic goal of direct governmental regulation through administrative bodies and the goal of indirect governmental regulation in the form of antitrust law is the same-- to achieve the most efficient allocation of resources possible. * * * Both types of regulation seek to establish an atmosphere which will stimulate innovations for better service at a lower cost. This analysis suggests that the two forms of economic regulation complement each other.'
 That opinion reviews the precedents supporting the theory of complementary regulation-- including the precedents noted in the text of this opinion, but takes care to point out, 130 U.S.App.D.C. at 227-228, 399 F.2d at 960-961:
 This is not to suggest, however, that regulatory agencies have jurisdiction to determine violations of the antitrust laws. See People of State of California v. F.P.C., supra, 369 U.S. at 490, 82 S.Ct. 901; United States v. Radio Corporation of America, supra, 358 U.S. at 350 n. 18, 79 S.Ct. 457; National Broad-casting Co. v. United States, 319 U.S. 190, 223-224, 73 (63) S.Ct. 998 (997, 87 L.Ed. 1344) (1943); Mansfield Journal Co. v. F.C.C., 86 U.S.App.D.C. 102, 107, 180 F.2d 28, 33 (1950). Nor are the agencies strictly bound by the dictates of these laws, for they can and do approve actions which violate antitrust policies where other economic, social and political considerations are found to be of overriding importance. In short, the antitrust laws are merely another tool which a regulatory agency employs to a greater or lesser degree to give 'understandable content to the broad statutory concept of the 'public interest." F.M.C. v. Aktiebolaget Svenska Amerika Linien, supra, 390 U.S. at 244, 88 S.Ct. at 1009.
 
 
 [17]
 See Annual Report for 1967, ch. 16, Industrial Participation Aspects (pp. 271-4):
 A policy set forth in the Atomic Energy Act is that the development, use, and control of atomic energy will 'be directed so as to make the maximum contribution to the general welfare' and 'strengthen free competition in private enterprise.' Accordingly, the development of a strong, competitive, commercial, nuclear industry has been a major objective of the AFC, particularly since passage of the Atomic Energy Act of 1954 which permitted private ownership of facilities such as reactors. Competition in the Nuclear Industry
 In developing policies governing the furnishing of nuclear-associated services to the public and in the execution of its regulatory responsibilities under the Atomic Energy Act of 1954, as amended, the AEC performs functions which have a profound effect on the status of the nuclear power industry. It is also clear from provisions of the Act, that the AEC is expected to carry out all of its activities in a manner consistent with the antitrust laws as administered by the Department of Justice.
 Industry Study. To assist the Commissioners and the Department of Justice in fulfilling their responsibilities under the Atomic Energy Act and antitrust legislation, the two agencies are working on a joint project of examining all aspects of competition in the new and developing nuclear industry. Under an AEC contract, A. D. Little, Inc., of Cambridge, Mass., is making a study of competition in the nuclear industry to assist the project. For the purpose of the study, the nuclear power supply industry is deemed to consist of those firms engaged in the business of supplying reactors, reactor components, nuclear fuel, or other products and services associated with the design, construction and operation of nuclear-electric plants including the entire fuel cycle. It is possible that the study will provide the basis for preparation and consideration of guidelines for the healthy development of competition in the emerging nuclear industry.
 
 
 [18]
 That the Commission is not controlled by antitrust considerations, or the Attorney General's advice, but may determine the matter on the basis of what it deems to be overriding considerations of health, safety or defense, is established by the legislative history, the AEC regulations, and the contemporaneous understanding of the Attorney General. See Jacobs and Melchior, Antitrust Aspects of the Atomic Energy Industry, 25 Geo.Wash.L.Rev. 508, 516-517 (1957). The authors quote a January 24, 1957, address of the Attorney General to the New York State Bar Association, which focuses on the significance of 105 as providing an 'efffective procedure.' In that address the Attorney General said:
 This provision, patterned after earlier surplus property disposal laws makes available to the Commission analysis of any special anti-competitive considerations presented. Antitrust advice, however, need not be controlling. For the Commission must also weigh the necessities of defense and security and public health and safety. None-theless such a procedure provides an effective means to insure that knowledge of possible antitrust difficulties required to foster competition.
 
 
 [19]
 Hearings on S. 3323, and H.R. 8862, To Amend the Atomic Energy Act of 1946, before the Joint Committee on Atomic Energy, 83rd Cong., 2d Sess. p. 497 (1954), II Legis.Hist. 2131. (Reference is to the Legislative History of the 1954 act compiled by the Atomic Energy Commission.)
 The witness had also complained of a proposed change from the 1946 language declaring the policy of directing development of atomic energy toward 'strengthening free competition in private enterprise.' The bill under consideration by the Committee proposed to change the quoted phrase to 'foster our system of free enterprise.' Mr. Cole stated that no substantive change was intended by this modification in language, and he agreed to revert back to the 1946 language. This retention of the 1946 language appears in 1(b) of the 1954 act.
 
 
 [20]
 See particularly note 16 supra (and quotation from Northern Natural Gas opinion) and text thereto
 
 
 [21]
 I Legis.Hist. 45, 50-51
 
 
 [22]
 No significance for present purposes can be ascribed to S.Rep. No. 390, 89th Cong., 1st Sess. 4 (1965), cited in the majority opinion
 The context is entirely unrelated. The Committee Report explained the need to amend 271 of the Act to make clear that it did not confer on State or local agencies any authority to regulate or restrict activities of the Atomic Energy Commission. The amendment was prompted by a Court of Appeals opinion that under the pre-1965 version of 271-- providing that the Act did not affect the authority of a local agency as to transmission of electric power produced with licensed nuclear facilities-- the zoning ordinances of Woodside, California, prohibited the construction of an overhead line projected by the AEC in order to receive power for the servicing of a $114 million linear accelerator facility being built on Stanford University property pursuant to Congressional authorization.
 In a background section for this entirely unrelated provision the Committee Report contained a passage latched on to in the majority opinion as follows (p. 4):
 Because of these unique provisions in the act pertaining to AEC's licensing and regulation of persons operating reactors which could be used to produce electricity, there was some feeling of uneasiness among the drafters of the legislation over the effect of the new law upon other agencies-- Federal, State, and local-- having jurisdiction over the generation, sale, and transmission of electric power. It was recognized by the drafters that the authority of these other agencies with respect to the generation, sale, and transmission of electric power produced through the use of nuclear facilities was not affected by this new law; and that AEC's regulatory control was limited to considerations involving the common defense and security and the protection of the health and safety of the public with respect to the special hazards associated with the operation of nuclear facilities. Nevertheless, section 271 was added to make it explicit that licensees of the AEC who produced power through the use of nuclear facilities would otherwise remain subject to the authority of all appropriate Federal, State, and local authorities with respect to the generation, sale, or transmission of electric power.
 In context this indicates only that the AEC did not have direct regulatory control over the transmission of electric power. The words plainly do not embody a legislative determination that the AEC was forbidden to consider antitrust matters as a condition of licensing. If those words were meant to have that meaning they would also apply to 103 licensing.
 The AEC acquiesces that under 103 it should consider antitrust matters. Can it be supposed for one moment that this backdrop discussion, in passing, was meant to set aside this understanding? The discussion is irrelevant for present purposes.
 
 
 [1]
 I dissent, too, from the holding that the Commission properly denied intervention to the Massachusetts municipals on the ground that the motion to dismiss Vermont Yankee's application as improperly filed was not made in the initial petition. The antitrust allegations in the petition. provided adequate notice to the Commission that the jurisdictional distinction between research and development and commercial licenses was basic to the municipals' claim. The Commission did not sustain the Atomic Safety and Licensing Board's denial of intervention solely on this point of pleading, but cited the rationale of the Duke Power decision holding that jurisdiction under 104(b) was proper. To allow intervention to raise the jurisdictional issue would not have greatly expanded the proceedings, especially in light of its likely disposition. Cf. Northwest Airlines v. Civil Aeronautics Board, 90 U.S.App.D.C. 158, 164-165, 194 F.2d 339, 344-345 (1952)
 
 
 [2]
 The validity of the Securities and Exchange Commission's approval of Vermont Yankee's financing under 10(b)(1) of the Public Utility Holding Company Act, 15 U.S.C. 79j(b) (1964), was contested by the Massachusetts municipals on antitrust grounds in Municipal Electric Ass'n of Mass. v. Securities and Exchange Comm., 134 U.S.App.D.C. 145, 413 F.2d 1052 (decided March 26, 1969). The Commission's orders were set aside and the cases remanded for a hearing and reconsideration of the municipal's antitrust claims
 
 
 [3]
 This case stands in sharp contrast to the situation in Power Reactor Development Co. v. International Union of Electrical, etc., Workers, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). There the Supreme Court upheld the Commission's issuance of a provisional construction permit for a reactor, based on 'reasonable assurance' that there would be sufficient firm evidence that the reactor would meet operating safety standards by the time it was ready for service. All nuclear facilities are, of course, cleared for safety before they receive operating licenses. It seems at least bizarre that reasonable assurance is enough to predict safe operation, but not enough for a forecast of commercial profitability
 
 
 [4]
 'Thus, the consequences of a statutory finding of practical value with respect to present types of single purpose light water, nuclear power reactors for the production of energy for central station power are relatively narrow, since waiver of fuel use charges and research and development or direct design assistance is no longer being afforded by AEC to nuclear electric plants of this category that are now being sold, and it is well understood that AEC does not presently intend to recommend such aid and that the cognizant committee of Congress would not be likely to report favorably on its authorization.' 31 Fed.Reg. at 223
 
 
 [5]
 See letter of August 29, 1966, from Chairman Glenn T. Seaborg of the Commission to Representative Chet Holifield, Chairman of the Joint Committee on Atomic Energy, setting forth the consequences of a practical value determination. Hearings on Participation by Small Electrical Utilities in Nuclear Power Before the Joint Comm. on Atomic Energy, 90th Cong., 2d Sess., pt. 1, at 271-274 (1968)
 
 
 [6]
 The Commission conceded that Section 50.56 of its regulations (10 C.F.R. 50.56) required that plants licensed for construction as 104 research and development projects also receive their operating licenses under 104
 '50.56 Conversion of construction permit to license; or amendment of license. Upon completion of the construction or alteration of the facility, in compliance with the terms and conditions of the construction permit and subject to any necessary testing of the facility for health or safety purposes, the Commission will, in the absence of good cause shown to the contrary, issue a license of the class for which the construction permit was issued or an appropriate amendment of the license, as the case may be.'
 
 
 [7]
 See majority opinion at 973 supra. The majority's serious 'warning' to the Commission on this point should buttress the position of the Justice Department that 105(c) be given full effect. See majority opinion at 973, n. 9, supra
 
 
 [8]
 In a press release dated October 9, 1969, the Commission reported on the status of nuclear power plants as of September 30, 1969:
 The nation's electric capacity by conventional means as of June 30, 1969 was 321,153,088 kilowatts.
 
 
 [9]
 Indeed, a spokesman for the General Electric Corporation urged at the hearings on the 1954 Act that 'maximum reliance * * * be placed on willingness to risk capital in determining whether a new idea is of practical value.' Legislative History of the Atomic Energy Act of 1954, vol. II, at 1961